**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MICHELE MULLEN, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:25-cv-13010-JEK |
| GARY PELLETIER and PAUL COELHO, | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**KOBICK, J.**

This is a dispute between a resident of the Town of Norwood, plaintiff Michele Mullen, and two employees of the Norwood Building Department, Building Commissioner Gary Pelletier and Local Inspector Paul Coelho. Mullen asserts that Pelletier and Coelho have engaged in a pattern of conduct designed to thwart her home renovation project and have refused to perform a final inspection of that project, which is required before she may reside in or sell her home. The complaint alleges that they have retaliated against her in violation of the First Amendment; violated her due process and equal protection rights; and engaged in a civil conspiracy. The defendants now move to dismiss these claims, as well as Mullen's request for declaratory relief and a writ of mandamus. That motion will be granted in part and denied in part. Mullen states plausible claims for First Amendment retaliation and a procedural due process violation, and the defendants are not at present entitled to qualified immunity on those claims. The Court will, however, dismiss the equal protection, substantive due process, and civil conspiracy claims, and it will remand the writ of mandamus claim to Norfolk Superior Court.

**BACKGROUND**

The following facts, which are assumed true on a motion to dismiss, are drawn from the complaint, its attached exhibits, and documents fairly incorporated by reference in that pleading.

Plaintiff Michele Mullen purchased property on Vernon Street in Norwood, Massachusetts on October 25, 2024. ECF 1-1, ¶¶ 1, 9. She then hired a contractor, Michael Kennedy, for her home renovation project. *Id.* ¶ 10. On November 8, 2024, Kennedy submitted a permit application for the requested renovations and paid the permitting fee. *Id.* Officials from the Norwood Building Department accepted the fee and confirmed orally that the permit had been issued. *Id.* ¶ 11. Twelve days later, Kennedy called the Town to request a rough inspection. *Id.* ¶ 12. Defendant Paul Coelho, a local inspector for the Building Department, explained that the permit had never been formally issued "because 'the button was never pressed' in the system," so he instead conducted a "pre-inspection" of the property with Kennedy's permission. *Id.* ¶¶ 3, 13-15. The next day, Coelho issued a stop work order forbidding further work on the project without a permit. *Id.* ¶ 16.

Mullen and Kennedy visited the Building Department on November 26, 2024, to speak with Coelho about why the stop work order was issued. *Id*. ¶¶ 17, 20. While waiting, Mullen and Kennedy overheard Coelho disparaging Mullen and her family in his office. *Id.* ¶ 18. When he came out of the office, Mullen asked Coelho about his comments, and her questions appeared to anger Coelho. *Id.* ¶ 19. Mullen then asked about the permit, and Coelho replied that he "would get to it when he could" and aggressively pointed his finger at her. *Id.* ¶¶ 20-22. Coelho threatened to hold up the permit "for another 30 days," stating that "[y]ou get more with butter," and stopped speaking to Mullen. *Id.* ¶¶ 23-25.

On December 17, 2024, Mullen and Kennedy met with Town Manager Tony Mazzucco and defendant Gary Pelletier, the Norwood Building Commissioner, at the Town Hall. *Id.* ¶¶ 2, 29.

Outside of Pelletier's hearing, Mazzucco criticized Pelletier and promised to resolve the permitting issue on his own. *Id.* ¶¶ 30-31. As a result, the permit for Mullen's project was issued on December 21, 2024, but had been backdated to December 2. *Id.* ¶ 31; ECF 9-1, at 2.

On February 3, 2025, Pelletier refused to allow Kennedy to finish the basement renovation, claiming that Mullen was required to petition the Zoning Board of Appeals ("ZBA") for approval. ECF 1-1, ¶¶ 32-33. That day, Mullen contacted Mazzucco and voiced frustration with Pelletier's conduct. *Id.* ¶ 34. Mullen, Kennedy, and Attorney David Hearn then attended another Town Hall meeting on February 5, 2025 with Mazzucco and Pelletier. *Id.* ¶ 36. Attorney Hearn and Pelletier disagreed whether renovating the basement constituted an increase in the home's footprint requiring ZBA approval. *Id.* ¶¶ 37-39. But the parties agreed that classifying the basement as an Accessory Dwelling Unit would be allowed "by right." *Id.* ¶ 40.

Frustrated with Pelletier and Coelho's delays, Mullen filed a formal complaint with the Norwood Board of Selectmen on March 23, 2025 regarding Pelletier. *Id.* ¶ 41; ECF 1-1, at 41-42. Her letter characterized Pelletier's conduct throughout her renovation as rude and unprofessional, and it asserted that he had engaged in a pattern of harassment toward her and her spouse. ECF 1-1, at 41-42. The same day, Edward Forsberg, a plumbing inspector with the Building Department, entered Mullen's home without permission. *Id.* ¶ 42. Mullen alleges that his unlawful entry was done on Pelletier's orders and was part of Pelletier's broader pattern of retaliatory, and costly, acts. *Id.* ¶¶ 26-28, 42-45. For example, Pelletier had initially approved the insulation installed in the basement, but he later ordered it to be removed and replaced with a different insulation. *Id.* ¶¶ 46-47. Pelletier also required Mullen to remove a hybrid hot water tank. *Id.* ¶ 48. As Mullen's project neared completion, Pelletier, without warning, mandated a Home Energy Rating System ("HERS") rating for her renovation. *Id.* ¶ 49. Mullen believes that Pelletier knew that her renovation would

fail a HERS test without a hybrid hot water tank. *Id.* ¶ 50. Nevertheless, Kennedy arranged for a HERS test, and the project attained a HERS rating of 62. *Id.* ¶¶ 51-52.

A key dispute in this case is whether the HERS rating for Mullen's project was required to comply with the 9th or 10th editions of the State Building Code. Effective October 11, 2024, Massachusetts adopted the 10th edition of the Building Code. *Id.* ¶¶ 53-54; *see* 780 Code Mass. Regs. ("C.M.R.") 1.00 to 115.00.[1] The Code included a concurrency period from October 11, 2024 to June 30, 2025, during which time a homeowner applying for a building permit could choose to comply with either the 9th or 10th editions. *Id.* ¶¶ 55-56, 60; *see* 780 C.M.R. 51.00, § R102 ("Applications for building permits and related construction and other documents filed through June 30, 2025, may comply either with 780 CMR effective October 11, 2024 or with the Ninth Edition version of 780 CMR in effect immediately prior to amendment, but not a mix of both."). Mullen submitted her permit application on November 8, 2024 and it was issued effective December 2, 2024, both dates after the 10th edition had already taken effect, and she could thus choose the edition of the Code applicable to her construction project. ECF 1-1, ¶¶ 54, 59-60; ECF 9-1, at 2.

The question of which edition of the Building Code applies to Mullen's project matters because her HERS rating of 62 complied with the 10th edition of the Code, but did not comply with the 9th edition, which required a HERS rating of 55 or lower. ECF 1-1, ¶ 52. Pelletier's messaging regarding which edition of the Code applied to Mullen's project was inconsistent. In a July 18, 2025 email, he wrote to Kennedy that the "code in effect at the time of permitting is the code you are required to meet," thus indicating that the 10th edition of the Building Code applied

[1] The Massachusetts State Building Code includes the Base Code, Stretch Energy Code, and Specialized Code.

to Mullen's project. ECF 1-1, at 44. But he ultimately took the opposite position, contending that the 9th edition of the Building Code applied to her project. *Id.* ¶ 57. Based on this new position, Pelletier and Coelho then refused to conduct a final inspection of Mullen's property because the 9th edition required a HERS rating of 55 or lower, and Mullen's HERS rating was 62. *Id.* ¶¶ 52, 58. In refusing to inspect or issue a decision passing or failing the property, Mullen alleges, the defendants have intentionally prevented her from completing her project or seeking appellate administrative review of their decision. *Id.* ¶¶ 58, 61, 65, 72, 81. On July 19, 2025, Pelletier, for a second time, refused to inspect Mullen's property until it attained a HERS rating that complied with the 9th edition of the Building Code. *Id.* ¶¶ 63-64.

On August 25, 2025, Mullen initiated this lawsuit in Norfolk Superior Court. ECF 1, ¶ 1. Requesting damages and equitable relief, the complaint asserts claims against Pelletier and Coelho in their individual and official capacities. ECF 1-1, ¶¶ 2-3 and p. 22. Against both defendants, Mullen seeks a declaratory judgment (Count I) and a writ of mandamus (Count II). *Id.* ¶¶ 66-85. She also asserts a civil conspiracy claim (Count IV) and a claim under 42 U.S.C. § 1983, which alleges that the defendants have retaliated against her in violation of the First Amendment and have violated her Fourteenth Amendment procedural due process, substantive due process, and equal protection rights (all Count III). *Id.* ¶¶ 86-118. The defendants removed the case to this Court in October 2025, ECF 1, and then moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF 7. After receiving Mullen's opposition, the Court held a hearing and took the motion under advisement. ECF 9, 13.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most

favorable to the plaintif[f], the complaint states a claim for which relief can be granted," *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted).

## DISCUSSION

### I. Section 1983 Claims.

The Court first addresses Mullen's federal constitutional claims, brought under 42 U.S.C. § 1983, for violations of her First and Fourteenth Amendment rights.

#### A. First Amendment Retaliation Claim.

Mullen claims that Pelletier and Coelho retaliated against her for the exercise of her First Amendment rights to speak freely and petition the government. Pelletier and Coelho respond that they are entitled to qualified immunity on the claim. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity inquiry proceeds with a now-familiar two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quotation

marks omitted). The Court will address each prong in turn. *See Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) ("The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong.").

To make out a valid First Amendment retaliation claim, "a plaintiff must first show that [her] conduct was constitutionally protected and, second, [s]he must show proof of a causal connection between the allegedly protected conduct and the supposedly retaliatory response." *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016). Pelletier and Coelho do not dispute that Mullen engaged in constitutionally protected conduct when, on March 23, 2025, she sent a letter to the Norwood Board of Selectmen complaining of their conduct and seeking their removal. Instead, they argue that Mullen has not alleged any plausible causal connection between her letter and their refusal to conduct the final inspection. Causation is established "by showing that the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action," *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013), and "[t]emporal proximity alone may . . . support an inference of retaliation," *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011).

Taking the allegations in the complaint as true, Mullen has plausibly alleged a causal connection between the exercise of her First Amendment rights and the retaliatory responses from Pelletier and Coelho. The same day that Mullen submitted her complaint to the Board, Pelletier directed the plumbing inspector to enter her home without permission. In the weeks and months that followed, Mullen's renovation was repeatedly stymied by Pelletier's actions. Pelletier had initially approved the insulation installed on the property, but then, without reason, ordered it removed and replaced with a different insulation, burdening Mullen with significant costs. Pelletier also required the removal of a hybrid hot water tank, making her home's energy system less

efficient. And as the project was nearing completion in the summer of 2025, he required a HERS assessment that found the system noncompliant with the 9th edition of the Building Code. Then, even though the HERS rating complied with the 10th edition of the Building Code, which was in effect at the time, Pelletier and Coelho refused to perform a final inspection of her property. This refusal was based on an interpretation of the Building Code and other statutes that, as the defendants' counsel acknowledged at the hearing, is unsupported by any case law or precedent. Particularly in light of the short period of time between Mullen's letter and these alleged retaliatory actions, Mullen's complaint makes out the "necessary linkage" to survive a motion to dismiss. *Id.* at 17.

The defendants may still be entitled to qualified immunity if the law applicable to their actions was not clearly established. The "clearly established" prong involves two sub-inquiries. The first "'focuses on the clarity of the law at the time of the violation.'" *Penate*, 944 F.3d at 366 (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)). The second "'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.'" *Id.* (quoting *Drumgold*, 707 F.3d at 42). "[T]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

The law at the time clearly established that retaliating against an individual for submitting a complaint to the local Board of Selectmen, as the defendants are alleged to have done here, is unconstitutional. The First Circuit has long explained that the First Amendment "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Mercado-Berrios v. Cancel-Alegría*, 611 F.3d 18, 25 (1st Cir. 2010). On Mullen's version of the

facts, an objectively reasonable city official would have known that his conduct violated Mullen's First Amendment rights. The state of the law at the time was clear that "[r]etaliation is always reprehensible," *Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. 2014), and "even 'relatively minor events' can give rise to liability," *Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011) (citation omitted). Further, the law was clear that retaliation "may take many forms, ranging from potential negative treatment . . . to actual economic injury following the filing or pursuit of grievances." *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004). For example, in 1992, the First Circuit held that delaying issuance of, or denying, a permit because of speech is unconstitutional retaliatory conduct. *See Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 40-41 (1st Cir. 1992). Accordingly, if the facts alleged are true, it would have been clear to reasonable municipal officials in Pelletier and Coelho's shoes that their conduct was unconstitutional. Pelletier and Coelho are not, therefore, entitled to dismissal of Mullen's retaliation claim on the basis of qualified immunity.

B. Due Process Claims.

Mullen next asserts that Pelletier and Coelho violated her procedural and substantive due process rights under the Fourteenth Amendment by, among other things, refusing to perform a final inspection of her home, thereby denying her full use and enjoyment of her property. The defendants invoke qualified immunity as a defense to both claims.

*1. Procedural Due Process Claim.*

To establish a procedural due process violation, plaintiffs "must demonstrate that they have 'a property interest as defined by state law' and that the defendants deprived them of this property interest without constitutionally adequate process." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 270 (1st Cir. 2011) (quoting *SFW Arecibo, Ltd. v. Rodríguez*, 415 F.3d 135, 139 (1st Cir. 2005)). "In order to qualify as a property interest, state law must give an 'individual a legitimate claim of

entitlement to some sort of benefit.'" *Alvarado Aguilera v. Negron*, 509 F.3d 50, 53 (1st Cir. 2007) (quoting *Hatfield-Bermudez v. Aldanondo-Rivera*, 496 F.3d 51, 59 (1st Cir. 2007)).

The defendants argue that Mullen was not deprived of any protected property interest when they declined to conduct the final inspection of her home renovation project. Mullen responds that, under Massachusetts law, she has the right to a Certificate of Occupancy and the right to live in or sell her property. The Supreme Judicial Court has long held that the rights to "acquire, possess and protect property are secured to every one under the Constitution of Massachusetts." *Brett v. Building Comm'r of Brookline*, 250 Mass. 73, 77 (1924). This guarantee "include[s] the right to own land and to use and improve it according to the owner's conceptions of pleasure, comfort or profit, and of the exercise of liberty and the pursuit of happiness." *Id.* At the hearing, both parties represented that, without a Certificate of Occupancy, Mullen cannot lawfully live in or sell her home. *See also* 780 C.M.R. c. 1, pt. 2, § 111.1 ("No building or structure shall be used, or occupied . . . until the Building Commissioner . . . has issued a Certificate of Occupancy and Use."). And although the "constitutional right to use and improve [one's] property" is subject to "limitations on development lawfully imposed by State law or by municipal regulation," Mullen has plausibly alleged that the defendants are acting unlawfully in refusing to perform a final inspection. *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 396 (1996). The Building Code provides that "[f]inal inspection shall be made after the permitted work is complete and prior to final occupancy of the building or structure." 780 C.M.R. c. 1, pt. 2, § 110.3.10. As alleged in the complaint, the permitted work on Mullen's property is complete, she has obtained a HERS rating, and the final inspection is the last step needed before the issuance or denial of the Certificate of Occupancy. But the defendants have refused—for more than a year now—to conduct a final inspection based only on their contention that the 9th edition of the Building Code applies and Mullen has not met the HERS

standard set by that edition. Their refusal appears inconsistent with the Building Code's mandate that "final inspection *shall* be made." *Id.* (emphasis added). Accordingly, Mullen has plausibly alleged a deprivation of a protected property interest without a lawful basis. *See Swanset Dev. Corp.*, 423 Mass. at 396 (plaintiffs "alleged a direct deprivation of [property] rights" when "various delays were a deliberate attempt to frustrate their development plans").

Mullen must also plausibly allege that the "procedures attendant to that deprivation were constitutionally inadequate." *García-González v. Puig-Morales*, 761 F.3d 81, 88 (1st Cir. 2014); *see Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (procedural due process is "a guarantee of fair procedure" (quotation marks omitted)). The parties agree that Mullen has not received any pre-deprivation process. But the defendants contend that Mullen has failed to avail herself of a constitutionally adequate post-deprivation remedy, because she could have appealed their refusal to conduct a final inspection to the Building Code Appeals Board. This argument does not withstand scrutiny. The Building Code provides, in pertinent part, that "failures to act made by . . . any person . . . charged with the administration or enforcement of the state building code . . . , *except* the specialized codes of M.G.L. c. 143, § 96, . . . shall be addressed by the Building Code Appeals Board." 780 C.M.R. c. 1, pt. 2, § 113.1 (emphasis added); *see also* M.G.L. c. 143, § 100. Those "specialized codes" include the "specialized stretch energy code developed and promulgated by the department of energy resources." M.G.L. c. 143, § 96. The Stretch Energy Code is, as all parties agree, part of the Building Code and governs compliance with HERS ratings. *See id.* And here, the defendants refused to conduct a final inspection of Mullen's home based on their position that her project is out of compliance with the 9th edition of the Building Code. Their refusal to inspect Mullen's property over her HERS rating is not, accordingly, appealable to the Building Code Appeals Board under 780 C.M.R. c. 1, pt. 2, § 113.1. Mullen has therefore plausibly

alleged that she has no constitutionally adequate procedures attendant to the deprivation of her right to use and enjoy her property.

Nor does qualified immunity shield the defendants from Mullen's claim. The law is clear that depriving an individual of the right to live in or sell her property, without any process or lawful basis, is unconstitutional. The Supreme Court explained in 1992 that the "right of sale [and] the right of occupancy" of one's home "to be free from governmental interference" "is a private interest of historic and continuing importance." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993). Viewing the facts in the light most favorable to Mullen, an objectively reasonable municipal official would have known that his conduct violated her procedural due process rights. Mullen complied with Pelletier's demand to remove the hybrid hot water tank, which worsened the HERS rating for her home. But the HERS rating without the tank still adhered to the requirements of the 10th edition of the Building Code—the edition that, as Pelletier acknowledged, was "in effect at the time of permitting." ECF 1-1, at 44. And Mullen could not seek a procedural remedy for the defendants' refusal to conduct the final inspection, because the only remedy identified by the defendants—an appeal to the Building Code Appeals Board—was foreclosed under Massachusetts law. The facts here are sufficiently analogous to controlling precedent to put a reasonable official on notice that withholding from Mullen a final inspection and a Certificate of Occupancy is unconstitutional. *Compare Swanset Dev. Corp.*, 423 Mass. at 396 (finding a direct deprivation of rights when plaintiffs "allege that various delays were a deliberate attempt to frustrate their development plans"), *and Quinn v. Bryson*, 739 F.2d 8, 10 (1st Cir. 1984) (recognizing, under Massachusetts law, that plaintiffs "ha[ve] a [property] right to the building permit if their plans conformed to the building code"), *with Licari v. Ferruzzi*, 22 F.3d 344, 348 (1st Cir. 1994) (denying a procedural due process claim when post-deprivation remedies

were available and plaintiff had the right to appeal the building inspector's decision). Pelletier and Coelho are not, accordingly, entitled to dismissal of Mullen's procedural due process claim on the basis of qualified immunity at this early juncture.

2. *Substantive Due Process Claim.*

Mullen also asserts that Pelletier and Coelho violated her substantive due process rights. To state such a claim, she must plausibly allege that the defendants' actions "were so egregious as to shock the conscience and that they deprived [her] of a protected interest in life, liberty, or property." *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis omitted). To qualify as conscience-shocking, an official's conduct must be "extreme," "stunning," and "truly outrageous, uncivilized, and intolerable." *Id.* (quotation marks omitted). Ordinarily, "rejections of development projects and refusals to issue building permits" do not implicate substantive due process. *Licari*, 22 F.3d at 349 (quotation marks omitted).

Mullen argues that the defendants' alleged conduct—including failing to perform a final inspection of her home, sending a plumbing inspector into her home without permission, and forcing her to incur unnecessary renovation costs—is "truly outrageous, uncivilized, and intolerable." *Pagán*, 448 F.3d at 32 (quotation marks omitted). The defendants, once again, assert that they are entitled to qualified immunity on the claim. Bypassing the question whether Mullen has plausibly alleged conscience-shocking behavior, the Court concludes that Mullen has not met her burden to show that, in 2024 and 2025, it was clearly established that official conduct like that alleged here shocks the conscience. *See Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) (it is the plaintiff's "burden [to demonstrate] that the law was clearly established at the time of the alleged violation"). She has not identified any analogous case from this Court, the Supreme Judicial Court, the First Circuit, or the Supreme Court in which comparable municipal conduct was deemed

constitutionally egregious or intolerable. To the contrary, the cases she cites rejected substantive due process claims challenging similar conduct. *See, e.g.*, *Harron v. Town of Franklin*, 660 F.3d 531, 534, 536-37 (1st Cir. 2011) (rejecting substantive due process claim where town officials allegedly refused to permit transfer of liquor license after restaurant owner had renovated premises to allow for alcohol service and secured various building permits); *Mongeau v. City of Marlborough*, 492 F.3d 14, 19-20 (1st Cir. 2007) (same where city officials allegedly denied building permit and interfered in the zoning process for improper reasons). This case bears similarities to *Licari v. Ferruzzi*, in which the First Circuit rejected a substantive due process claim alleging that town officials revoked building permits arbitrarily after construction had commenced, issued unauthorized enforcement orders, and delayed processing the application for an amended permit. 22 F.3d at 346, 349-50. That Court noted the absence of allegations or evidence that the officials' "'hostility and animus' was aimed at any political affiliation, belief, stance, or immutable characteristic of" the plaintiff. *Id.* at 349. Such allegations are lacking in this case, too. In view of this precedent, Mullen has not demonstrated that it was clearly established that Pelletier and Coelho's comparable conduct shocks the conscience. The defendants are therefore entitled to qualified immunity, and the substantive due process claim will be dismissed.

C. Equal Protection Claim.

Mullen further asserts in Count III that Pelletier and Coelho violated her equal protection rights under the Fourteenth Amendment because they "selectively mistreated" her based on "impermissible, arbitrary and capricious considerations." ECF 1-1, ¶¶ 92, 94. She does not allege that she was mistreated based on a protected characteristic, like race or sex, nor does she allege membership in a class. But a plaintiff can "bring an equal protection claim as a 'class of one' even where [she] does 'not allege membership in a class or group.'" *Back Beach Neighbors Comm. v.*

*Town of Rockport*, 63 F.4th 126, 130 (1st Cir. 2023) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). To state such a claim, the plaintiff must allege that "'she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Id.* (quoting *Olech*, 528 U.S. at 564). She also bears the burden of identifying "comparators who are similarly situated in all respects relevant to the challenged government action," and must show an "extremely high degree of similarity" between herself and those comparators. *Id.* at 130-31 (quotation marks omitted).

Mullen fails to plausibly allege that any similarly situated comparators exist. At most, the complaint makes a conclusory allegation that "Mullen, compared with others similarly situated, was selectively mistreated." ECF 1-1, ¶ 94. But it fails to identify any individuals similarly situated to her who experienced different treatment from Pelletier or Coelho. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Back Beach Neighbors*, 63 F.4th at 131-32 (affirming dismissal of class of one equal protection claim for failure to plausibly allege the existence of similarly situated comparators). Accordingly, her equal protection claim must be dismissed.

## II. <u>Civil Conspiracy Claim.</u>

Mullen asserts in Count IV that Pelletier and Coelho engaged in a civil conspiracy by acting in unison to frustrate the permit approval process, refuse a final inspection, and retaliate against her for filing a formal complaint. "Massachusetts law recognizes two distinct theories of liability under the umbrella term of civil conspiracy: concerted action conspiracy, and true conspiracy based on coconspirators exerting some peculiar power of coercion." *Greene v. Philip Morris USA Inc.*, 491 Mass. 866, 871 (2023) (citations and quotation marks omitted). To plead a true conspiracy, "a plaintiff must prove that alleged conspirators agreed to accomplish an unlawful purpose or a lawful

purpose by unlawful means, and then caused harm to the plaintiff via some peculiar power of coercion that they would not have had, had they been acting independently." *Id.* at 875 n.10 (citations and quotation marks omitted). A concerted action conspiracy is "akin to a theory of common law joint liability in tort" and "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Id.* at 871 (quotations marks omitted). Mullen alleges both types of conspiracy.

Pelletier and Coelho contend that both of her theories of conspiracy are foreclosed by the intra-corporate conspiracy doctrine, under which "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017).[2] The doctrine recognizes that "[w]hen two agents of the same legal entity make an agreement in the course of their official duties, . . . as a practical and legal matter their acts are attributed to their principal." *Id.* When agents working for the same legal entity allegedly "ac[t] 'for their sole personal benefit and thus outside the course and scope of their employment,'" however, "the intra-corporate conspiracy doctrine does not apply." *Insulet Corp. v. EOFlow Co.*, 755 F. Supp. 3d 70, 97 (D. Mass. 2024) (quoting *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999)).

Mullen's civil conspiracy claim is brought against two employees of the Town of Norwood Building Department. Although the complaint names Pelletier and Coelho in their official and

[2] Federal courts have consistently applied this doctrine to civil conspiracy claims made under Massachusetts law. *See, e.g.*, *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 131 (1st Cir. 2006); *Hagenah v. Berkshire Cnty. ARC, Inc.*, No. 16-cv-30141-KAR, 2018 WL 907407, at *8 (D. Mass. Feb. 15, 2018) (collecting cases); *Wentworth Precious Metals, LLC v. City of Everett*, No. 11-cv-10909-DPW, 2013 WL 441094, *14 (D. Mass. Feb. 4, 2013) ("The conspiracy claim fails under both federal and state law for the independent reason that the City cannot conspire with itself.").

individual capacities, Mullen does not contend that their challenged actions were undertaken "for their sole personal benefit." *Id.* (quotation marks omitted). Nor does she offer any argument to rebut the defendants' contention that the intra-corporate conspiracy doctrine bars her civil conspiracy claim. Accordingly, under the intra-corporate conspiracy doctrine, Pelletier and Coelho were legally incapable of conspiring together when acting in the scope of their employment, and the civil conspiracy claim will be dismissed. *See, e.g.*, *Traudt v. Lebanon Police Dep't*, 749 F. Supp. 3d 251, 260-61 (D.N.H. 2024) (dismissing civil conspiracy claim against municipal employees pursuant to intra-corporate conspiracy doctrine); *Ortolano v. City of Nashua*, 695 F. Supp. 3d 221, 237 (D.N.H. 2023) (same); *Wentworth Precious Metals, LLC v. City of Everett*, No. 11-cv-10909-DPW, 2013 WL 441094, at *14 (D. Mass. Feb. 4, 2013) (when municipal employees "ac[t] in the course of their employment, they ac[t] on behalf of the City").

## III. <u>Claim for Declaratory Relief.</u>

Count I, a claim for declaratory judgment, seeks a declaration regarding the lawfulness of the defendants' refusal to perform a final inspection of Mullen's property. The defendants seek dismissal of the claim on the basis that there is no justiciable controversy for the Court to decide.[3] But they offer no substantive argument as to why, in their view, this case lacks a justiciable controversy. Mullen's allegations make plain that she has standing to assert her claims, as she has allegedly been injured by the defendants' conduct, including their refusal to perform a final inspection of her home; the injury is plainly traceable to the defendants; and this Court could afford her a remedy, in the form of money damages and equitable relief, if she proves her claims. *See*

[3] Although Mullen's claim is asserted under the Massachusetts Declaratory Judgment Act, M.G.L. c. 231A, "the justiciability of [a claim for declaratory relief] is properly considered under the federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, rather than under" M.G.L. c. 231A. *Tocci Bldg. Corp. of New Jersey v. Virginia Sur. Co.*, 750 F. Supp. 2d 316, 320 n.2 (D. Mass. 2010).

*Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (elements of Article III standing). The defendants make no argument, nor could they do so in good faith, that this case is not ripe for adjudication. And, as discussed, Mullen has plausibly alleged First Amendment retaliation and procedural due process claims. Accordingly, her claim for declaratory relief will not be dismissed for lack of a justiciable controversy.

## IV. **Writ of Mandamus Claim.**

Finally, Count II asserts that Mullen is entitled to a writ of mandamus directing the defendants to perform their duties under the relevant zoning bylaws and Massachusetts statutes. Under Federal Rule of Civil Procedure 81(b), writs of "mandamus are abolished," but "[r]elief previously available through [those writs] may be obtained by appropriate action or motion." Fed. R. Civ. P. 81(b). Writs of mandamus are authorized under Massachusetts law "to compel a public official to perform an act which the official has a legal duty to perform." *Lutheran Serv. Assoc. of New England, Inc. v. Metro. Dist. Comm'n*, 397 Mass. 341, 344 (1986); *see* M.G.L. c. 249, § 5. But federal district courts lack authority to compel state officers to act in accordance with state law pursuant to such writs. *See, e.g.*, *Butt v. Zimmerman*, 2022 WL 5237916, at *2 (11th Cir. Oct. 6, 2022) ("[F]ederal courts lack jurisdiction to issue writs of mandamus to direct state officials in performing their state duties."); *Demos v. U.S. Dist. Ct. for E. Dist. of Washington*, 925 F.2d 1160, 1161-62 (9th Cir. 1991) (same); *Coniston Corp. v. Vill. of Hoffman Ests.*, 844 F.2d 461, 469 (7th Cir. 1988) (same). Accordingly, this Court lacks jurisdiction to issue a writ of mandamus requiring the defendants, two local officials, to perform duties allegedly required of them under Massachusetts statutes and zoning bylaws. Rather than dismiss Mullen's claim, however, the Court will sever it from this action and remand it to the Norfolk Superior Court pursuant to 28 U.S.C. § 1441(c)(2), so that Mullen may pursue mandamus relief in a court of competent jurisdiction.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the defendants' motion to dismiss, ECF 7, is GRANTED in part and DENIED in part. Count I remains. Count II is severed and remanded to the Norfolk Superior Court. The equal protection and substantive due process claims asserted in Count III are DISMISSED, but the First Amendment retaliation and procedural due process claims remain. Count IV is DISMISSED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 28, 2026